# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 24, 2011 Session

## WILLIE J. HIGH v. SUMNER COUNTY, TENNESSEE

**Appeal from the Chancery Court for Sumner County**
**No. 2009C-233     Tom E. Gray, Chancellor**

---

**No. M2010-01899-COA-R3-CV - Filed July 21, 2011**

---

An employee of Sumner County was injured on the job and sought disability benefits pursuant to the Sumner County compensation plan. The employee's physicians initially gave him an anatomical impairment rating of 20%, but later determined that the employee was totally disabled and could not work. The County treated the employee's disability as a permanent partial disability and offered the employee a lower settlement than if the employee's disability were treated as a total permanent disability. The employee appealed the initial offer to the administrative review board, which upheld the initial offer of settlement. The employee petitioned the chancery court for a writ of certiorari and asked the court to review the administrative decision and rule that it was arbitrary and capricious. The chancery court found the review board should have considered whether the employee was totally disabled based on the evidence in the record and remanded the case back to the review board for this purpose. The County appealed, and we affirm the trial court's decision. The plain language of the county plan does not support the administrative decision not to consider the employee's total disability in determining the compensation he is entitled to receive.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Alvin Scott Derrick, Thomas Baird Russell, Nashville, Tennessee; Leah Mead May Dennen, Gallatin, Tennessee, for the appellant, Sumner County, Tennessee.

Michael L. Underhill, William Leonard Underhill, Nashville, Tennessee, for the appellee, Willie J. High.

# OPINION

## I. BACKGROUND

Willie J. High was working for Sumner County, Tennessee as a parts department manager on November 16, 2006, when he injured his lower back and left leg while lifting a 100-pound hydraulic motor for a spindle. A CT scan revealed a significant disc herniation at L4-5 on the left side, and on December 28, 2006, he received a lumbar laminectomy. Following physical therapy, Mr. High's physician released him the following April at maximum medical improvement with a 10% permanent physical impairment to the whole person and permanent restrictions to lift no more than 40 pounds, avoid repetitive bending/stooping, and avoid staying in the same position for prolonged periods of time. Mr. High was referred to Dr. Jeffrey Hazlewood, a pain management physician, for chronic radiculopathy, and he returned to work for Sumner County.

Mr. High re-injured himself at work on August 21, 2007, while pushing a 50-pound box with his right foot. An MRI scan revealed mild to moderate right foraminal stenosis with a shallow right disc protrusion at L3-4, and a CT myelogram study revealed some left L3-4 and L4-5 foraminal compression as well as central canal stenosis at L4-5. The neurological surgeon Dr. Marshall Watson performed a redo lumbar laminectomy with bilateral decompression of L3-4, L4-5, and L5-S1 for recurrent disc herniation. Following physical therapy, Dr. Watson released Mr. High at maximum medical improvement on June 23, 2008, with a 20% permanent physical impairment to the whole person. Dr. Watson imposed permanent restrictions on Mr. High's physical activity that included light duty with no repetitive bending or lifting, no operation of machinery, including motor vehicles, and no sitting for longer than 30 minutes. Mr. High did not return to work for Sumner County because Sumner County could not accommodate Mr. High's restrictions.

Mr. High continued to suffer pain in his lower back and left leg following his second surgery. Dr. Watson drafted a letter dated October 18, 2008, in which he stated, "On a *subjective* assessment, I highly doubt Mr. High will ever return to any functioning work and, as such, think he would be an excellent disability candidate."

Mr. High returned to see Dr. Hazlewood for pain management due to the severity of his pain. Dr. Hazlewood wrote a letter dated October 27, 2008, in which he said:

> In my opinion, Mr. High is not able to perform any type of work. He has significant pain, which leads to his inability to sustain any positions more than fifteen minutes at a time. I do not feel that he can bend other than just occasionally. He cannot lift, push, or pull more than 10 lbs. occasionally. I

think he would miss significant days of work per month because of this pain. In summary, I feel he is totally disabled and will be permanently disabled, in my opinion.

## II. OCCUPATIONAL COMPENSATION PLAN OF SUMNER COUNTY

Sumner County has adopted the Occupational Compensation Plan of Sumner County (the "Plan") to provide benefits to Sumner County employees injured on the job. The stated purpose of the Plan is to replace the Tennessee Workers Compensation Act as applicable to employees of Sumner County. Plan, § 1-102. The Office of Risk Management ("Risk Management") administers the Plan.

If an employee becomes disabled as the result of an on-the-job injury, the Plan provides compensation for temporary total disability, temporary partial disability, permanent partial disability, and permanent total disability. The Plan defines permanent total disability as follows:

> When an injury not otherwise specifically provided for in this Plan, totally incapacitates the employee from working at an occupation which brings such employee an income, such employee shall be considered "totally disabled," and for such disability compensation shall be paid as provided in subdivision (4)(A); provided, that the total amount of compensation payable hereunder shall not exceed the maximum total benefit, exclusive of medical and hospital benefits.

Plan, §3-307(4)(B).

The Plan describes permanent partial disability as "partial disability but adjudged to be permanent." Plan, § 3-307(3)(A).

There is a provision in the section entitled "Medical attendance and hospitalization – Reports – Physical examinations" that directs an employee's physician to determine the employee's anatomical impairment following an injury:

> To provide uniformity and fairness for all parties, any medical report prepared by a physician furnishing medical treatment to an employee shall use the American Medical Association Guides to the Evaluation of Permanent Impairment (American Medical Association) or the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment (American Academy of Orthopedic Surgeons). The physician shall utilize the most recent edition

of either publication in determining the degree of anatomical impairment. The physician shall be required to give an impairment rating based on one (1) of the two (2) publications.

Plan, § 3-304(d)(3). An employee's anatomical impairment then determines how much compensation the employee suffering from a permanent partial disability is entitled to receive under the Plan:

(a) In cases where an injured employee is eligible to receive any permanent partial disability benefits, pursuant to § 3-307(3)(A) and (F), and the County returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is one (1) time the medical impairment as determined by the guidelines designated in § 3-304(d)(3).

(b) In cases where an injured employee is eligible to receive permanent partial benefits pursuant to § 3-307(3)(A) and (F), and the County does not return the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is two (2) times the medical impairment as determined by the guidelines designated in § 3-304(d).

The Plan provides that an employee who suffers a permanent partial disability shall receive 662/3% of his or her average weekly wages for up to 400 weeks. Plan, §3-307(3). If an employee suffers a permanent total disability, the employee will receive 662/3% of his or her wages until he or she reaches the age of 65. Plan, §3-307(4)(A)(i).

### III. ADMINISTRATIVE PROCEEDINGS

Once Mr. High realized he was not going to be able to return to any sort of work, he submitted a claim to Risk Management for permanent total disability. Based on the first two letters from Mr. High's physicians indicating a permanent partial injury of 10% and then 20% to the whole person, Risk Management treated Mr. High's injury as a permanent partial disability rather than as a permanent total disability and relied on section 3-314(b) to calculate the benefits to which Mr. High was entitled. In accordance with that section of the Plan, Risk Management doubled the medical impairment of 20% to 40% and offered Mr. High the lump sum of $64,064.

Mr. High rejected this offer by Risk Management and appealed his claim to the

Occupational Compensation Review Board (the "Review Board"). The Review Board was made up of three members, and it held a hearing on September 16, 2009. The County explained during the hearing that its settlement offer to Mr. High was based on the Plan's permanent partial disability provisions, and that it did not consider the permanent total disability section of the Plan when calculating the benefits to which Mr. High was entitled. The County stated:

> [T]he situation with our plan [is] it has always been that you had to have a major medical impairment pursuant to the American Medical Association Impairment Standards. The letters written by Dr. Hazlewood and Dr. Watson, while I appreciate what they have to say, they do not have the number in them. This Plan has operated off of math. That is how we do it. If the doctor had said he was 100% impaired we would use that number in the calculator. . . . There is no rating for vocational disability, there is no rating for occupational loss. It is strictly a matter of medical impairment rating. The first rating that Mr. High received was actually only 10% rating to the body as a whole but he later received a rating for 20% to the body as a whole and the Committee used the second rating.

The argument at the hearing included the following colloquy:

County Attorney: We have Doctors send those letters that someone is 100% disabled and they will testify that it is by the AMA Guidelines and we pay them.

Review Board: So if Dr. Hazlewood or Dr. Watson were to say [Mr. High] was 100% disabled or based on the Guidelines, you would do the math that way?

Mr. High's Attorney: [B]ut as you know impairment and disability are two different things. The AMA does not assess disability.

Review Board: I know.

County Attorney: We have gone back based upon those letters and asked if you want to change your rating and got no additional response.

Review Board: Dr. Hazlewood never gave him a disability rating at all.

. . . . .

Review Board:     When [the Plan] talks about the schedule and it talks about the caps it specifically starts out that this is for permanent partial disability injury.  There are two totally different sections for permanent total disability and one for permanent partial disability.

County Attorney:     I could have a better ability to agree with you if these two doctors would have provided me with something that went along with that.  They did not however.

Review Board:     They did go on to say, I feel he is totally disabled and will be permanently disabled.  The letters say that he doubts that he will ever be able to do any functioning work.

County Attorney:     . . . We went back repeatedly trying to get someone to give us more information based on the AMA Guidelines that would coordinate that and no one could give it to us.  That is all we were told. . . .

Review Board:     There is nothing in the Plan that talks about Permanent Total Disability.  The caps of 1 time and 2 times, that section specifically starts out in saying that in Permanent Partial Disability situations.  But if you have 2 doctors that say he is Permanently Totally Disabled that is why this claim should move to section 4A and out of the part that talks about Permanent Partial Disability.  That means it can only be assessed at x number times the impairment rating, the maximum Permanent Partial Disability, and we have 2 doctors saying he is permanently disabled not partially disabled.

. . . . .

County Attorney:     Right, but the Permanent Partial Disability letter still exists.  It has not been withdrawn; it is 20% to the Body as a Whole.  In other cases the doctor has withdrawn that and come back with a different rating.

. . . . .

Review Board:     The way I understand it, I think he is entitled to more but we can't give it to him.  Even if we did vote to give him more it is not going to help him any.  If we vote for more they are going to cut it back down anyway.  We do not have any say so, is that right?

County Attorney:     That is my argument.

-6-

. . . . .

Review Board:    So if we were to award higher than 2 times the 20% the County would appeal or it would have to go to the County Commission to approve the award and then if the County Commission awarded 100% Total Disability, would the County then appeal?

County Attorney:    It would be up to the County Commission. . . .

. . . . .

Review Board:    Procedurally what can we do?

County Attorney:    Procedurally you can do nothing, which will cause the missing decision to stand, which is to offer him $64,064 in a lump sum to be paid to him. . . .

The County Attorney then indicated that if Mr. High wanted to challenge the County's offer of settlement in court it would be best for the Review Board to "just pass this on and let them go ahead and file." One member of the Review Board thus moved to reinstate the County's initial settlement offer of $64,064, another member seconded that motion "reluctantly," and the third member voted "No."

## IV. TRIAL COURT PROCEEDINGS

Following the hearing before the Review Board, Mr. High filed a common law petition for writ of certiorari asking the Chancery Court of Sumner County to review the administrative proceedings and to declare the Review Board's action affirming the County's settlement offer was arbitrary, capricious, and an abuse of its discretion. Following a hearing, the trial court issued a Final Order and Judgment of the Court which stated in pertinent part:

Upon conclusion of the proof at trial, the Court found the Occupational Compensation Review Board acted arbitrarily and capriciously on September 16, 2009 by a vote of 2 to 1 against Plaintiff; the decision of the Occupational Compensation Review Board on September 16, 2009 was willful and unreasonable action without consideration or in disregard of facts or without determining principle; and the matter was remanded back to the Occupational Compensation Review Board to consider the disability and whether or not the

-7-

employee is permanently disabled.

The Court's Ruling contained the following findings of fact and conclusions of law:

> The Occupational Compensation Review Board did not consider any matter of whether or not there was a permanent total disability issue, and the Court is of the opinion that they should have looked at the permanent total disability. The plan interpreted by Ms. Dennen is that it's capped, a capped plan. But the employee was not able to continue working under the restrictions that he was given.
>
> And further, the Court's determination that it was arbitrary and capricious by definition is Mr. Freeman said, "The way I understand it I think he is entitled to more, but we can't give it to him. Even if we did vote to give him more it's not going to help him any. If we vote for more they're going to cut it back down anyway. We do not have any say so. Is that right?" And Ms. Dennen's answer, "That's my argument. That's my argument."
>
> . . . The Court remands the matter to the Occupational Compensation Review Board to consider the disability and whether or not he, the employee, is permanently disabled.

The County asked the court to remand the case back to Risk Management rather than to the Review Board. The court rejected this request, stating, "The Court finds that it is the Review Board that takes a look and examines this matter, and they can take a look and make their findings of fact on what to do."

## V. ISSUES ON APPEAL

The County appealed the trial court's determination that the Review Board's decision upholding the settlement offer initially made by Risk Management was arbitrary and capricious. Additionally, the County requests that if we affirm the trial court's decision that the Review Board was acting arbitrarily and/or capriciously, we send the case back to Risk Management rather than to the Review Board.

## VI. ANALYSIS

### A. STANDARD OF REVIEW

The common law writ of certiorari provides an avenue for a court to review an

-8-

administrative decision. Tenn. Code Ann. §27-8-101; *Demonbreun v. Metropolitan Bd. of Zoning Appeals*, 206 S.W.3d 42, 46 (Tenn. Ct. App. 2005). "In such a review, the action of the administrative body may be reversed or modified only upon a determination that the action was: (1) in violation of constitutional or statutory provisions; (2) in excess of statutory authority; (3) an unlawful procedure; (4) arbitrary or capricious; or (5) unsupported by material evidence." *Id.* (citing *Massey v. Shelby County Retirement Bd.*, 813 S.W.2d 462, 464 (Tenn. Ct. App. 1991)); *Christmas v. Town of Smyrna*, 2010 WL 4962900, at *2 (Tenn. Ct. App., Dec. 6, 2010). Additionally,

> In proceedings involving a common law writ of certiorari, illegal, arbitrary, or fraudulent actions include: 1) the failure to follow minimum standards of due process; 2) the misrepresentation or misapplication of a legal standard; 3) basing a decision on ulterior motives; and 4) violating applicable constitutional standards.

*Harding Academy v. the Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 350, 363 (Tenn. 2007) (citing *Hoover, Inc. v. Metro Bd. of Zoning Appeals,* 924 S.W.2d 900, 905 (Tenn. Ct. App. 1996)). On appeal, the scope of our review is no broader than that of the trial court. *Demonbreun*, 206 S.W.3d at 46; *Christmas*, 2010 WL 4962900, at *2.

### B. THE REVIEW BOARD'S DECISION WAS ARBITRARY AND CAPRICIOUS

Risk Management provided the trial court with an affidavit by Kimberly White, its Claims Manager. In her affidavit, Ms. White explained how Risk Management interprets the Plan:

> Risk Management has consistently interpreted and applied the Plan to require any medical report submitted to us regarding an employee's claim under the Plan to use either the American Medical Association Guides to the Evaluation of Permanent Impairment or the Manual of Orthopedic Surgeons in Evaluating Permanent Physical Impairment. We have consistently not considered as valid under the Plan vocational ratings, vocational disability percentages, or generalized statements of inability to work, but rather have relied exclusively on determinations of anatomical impairment based on one of the two mentioned guidelines.

Mr. High submitted letters from two of his physicians, Dr. Hazlewood and Dr. Watson, who opined that Mr. High was "totally disabled" and would not ever return to "any functioning work." Based on Ms. White's affidavit and the County's argument before the

Review Board, it appears Risk Management relied exclusively on an earlier letter Mr. High submitted from Dr. Watson indicating Mr. High suffered a 20% impairment to his body as a whole and completely disregarded the later two letters from Drs. Hazlewood and Watson.[1]

The Plan specifically provides compensation for an employee's permanent total disability. Section 3-307(4)(B) starts out, "When an injury not otherwise specifically provided for in this Plan, totally incapacitates the employee from working at an occupation which brings such employee an income, such employee shall be considered 'totally disabled,' and for such disability compensation shall be paid . . . ." During oral argument the County focused on the initial phrase "when an injury not otherwise specifically provided for in this Plan" to explain why it did not believe Mr. High fit within this provision. When asked how the Plan "otherwise specifically provided for" Mr. High, the County pointed to section 3-304(d)(3), and explained that Mr. High's doctor had given him an anatomical impairment of 20%. The County went on to explain that since Mr. High was unable to return to work, he was entitled to have his medical impairment doubled to 40% pursuant to section 3-314(b).

The difficulty we have with the County's argument is that section 3-314 is limited by its terms to permanent **partial** disabilities. It does not apply to permanent **total** disabilities. Mr. High's physicians may have initially thought he was only partially disabled, but they later concluded Mr. High was totally disabled. The County does not dispute that Mr. High suffers from a permanent total disability.[2] Therefore, there seems to be no other way to interpret the Plan than to conclude that Mr. High's injury is "not otherwise specifically provided for in this Plan" and to refer to section 3-307(4)(A) and (B) of the Plan to determine the compensation Mr. High is entitled to receive under those sections.

The County argues that courts should defer to an agency's interpretation of its own rules and that the trial court erred in failing to defer to Risk Management's interpretation of the Plan. However, "the rule of giving great weight to administrative interpretations is not applicable where the language of the statute is plain and the meaning is obviously different from the administrative construction." *Covington Pike Toyota v. Cardwell*, 829 S.W.2d 132, 134 (Tenn. 1992) (citing *South Cent. Bell Tel. Co. v. Olsen*, 669 S.W.2d 649, 652 (Tenn. 1984) and *Liberty Cash Grocers v. Atkins*, 304 S.W.2d 633, 635 (Tenn. 1957)). We find the

---

[1]While Dr. Watson initially believed Mr. High suffered a 20% impairment to his body as a whole in June 2008, Dr. Watson revised his opinion by October 2008 when he expressed his doubt that Mr. High would "ever return to any functioning work." The record shows Mr. High suffered significant pain following his second surgery and that this pain prevents Mr. High from engaging in productive work from which he can earn an income.

[2]According to the record, the extent of Mr. High's disability is not in dispute. The only issue is how to compensate Mr. High for his disability under the Plan.

language of the Plan to be plain and its meaning to be different from the way Risk Management interprets it. Thus, we are not constrained by Risk Management's interpretation of the Plan.

We agree with the trial court's finding that the Review Board did not consider whether or not Mr. High suffered from a permanent total disability issue and that it should have considered this in reviewing Risk Management's settlement offer. Further, we conclude, as did the trial court, that the Review Board acted in an arbitrary and capricious manner in upholding Risk Management's interpretation of the Plan because that interpretation was incorrect.

### C. THE CASE SHOULD BE REMANDED TO THE REVIEW BOARD

The only issue left to address is whether the trial court acted appropriately in remanding this matter back to the Review Board rather than to Risk Management, as the County suggests. The Plan states that the Review Board is "to serve as the tribunal for appeals" and is directed to "hear appeals from employees that file a request who dispute the findings of the Office of Risk Management and the Casualty Insurance Board . . . ." Plan, §3-317(a) and (b). Mr. High petitioned the trial court for a writ of certiorari to review the decision of the Review Board, not to review the decision by Risk Management. The Review Board, not Risk Management, was acting in a quasi-judicial capacity when it upheld the settlement offer made by Risk Management. Therefore, the trial court was correct in remanding the case back to the Review Board and directing it to consider Mr. High's permanent total disability. *See State ex. Rel. Moore & Associates v. West*, 246 S.W.3d 569, 574 (Tenn. Ct. App. 2005) (remanding case to quasi-judicial administrative board for further proceedings is remedy appellate courts use most often in writ of certiorari cases).

### VII. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment granting Mr. High's petition for writ of certiorari and conclusion that the Review Board acted in an arbitrary and capricious manner in upholding the settlement offer made by Risk Management. This matter is remanded back to the Review Board to consider Mr. High's permanent total disability and determine the appropriate compensation to offer him under the Plan.

_____
PATRICIA J. COTTRELL, JUDGE

-11-